**\*NOT FOR PUBLICATION**

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| | : | |
| RAHEEM VENABLE, | : | |
| | : | Civil Action No. 15-6958 (SDW) |
| Petitioner, | : | |
| | : | |
| v. | : | **OPINION** |
| | : | |
| STEPHEN JOHNSON, et al. | : | |
| | : | |
| Respondents. | : | |
| | : | |

**WIGENTON**, District Judge:

Presently before the Court is the amended petition for a writ of habeas corpus of Raheem

Venable ("Petitioner") brought pursuant to 28 U.S.C. § 2254 challenging Petitioner's state court

conviction (ECF No. 5).   Following this Court's Order to Answer, the State filed a response to

the petition (ECF Nos. 9-10), to which Petitioner has replied (ECF No. 13).   For the following

reasons, this Court will deny the petition and deny Petitioner a certificate of appealability.

### I.  BACKGROUND

In its opinion affirming Petitioner's conviction, the Superior Court of New Jersey –

Appellate Division offered the following summary of the basic facts underlying this case:

> A jury found codefendants [Petitioner] and Malik Simmons guilty
> of purposeful or knowing murder, in violation of N.J.S.A. 2C:11-
> 3(a)(1),(2); possession of a handgun without a permit, in violation
> of N.J.S.A. 2C:39-5(b); and possession of a weapon for an unlawful
> purpose, in violation of N.J.S.A. 2C:39-4(a).   The trial court
> sentenced [Petitioner] to life imprisonment, subject to the sixty-
> three year and nine-month period of parole ineligibility mandated

by the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, for the murder, and a concurrent ten-year term of imprisonment for possession of a handgun without a permit.  The court sentenced Simmons to a forty-year term of imprisonment, subject to the thirty-four year period of parole ineligibility mandated by NERA for the murder, and a concurrent five-year term for possession of a handgun without a permit.  The court merged defendants' convictions for possession of a weapon for an unlawful purpose.

Defendants' convictions were based on the death of Fahiym Phelps as a result of a shooting outside a bar in Irvington on the night of November 27, 2004.  Before the shooting, Phelps was inside the bar with his brother, Sharif, and a cousin, Tashon Young.  During that time, Phelps had a verbal altercation with [Petitioner], which was witnessed by Sharif, Young, and the manager of the bar, Sean Dubose.  The altercation was interrupted by Dubose, who had a security guard, Michael Gibbs, escort [Petitioner] outside the bar, while Dubose stayed inside with Phelps.

The bar closed approximately ten minutes later, at which time Phelps, Sharif, and Young walked outside, where they encountered [Petitioner] and Simmons, both of whom were armed with handguns.  [Petitioner and Simmons] began shooting in Phelps's direction, discharging between six and ten bullets.  Six of the bullets struck Phelps, causing fatal injuries.

After the crime, Sharif and Young identified both [Petitioner] and Simmons as the shooters from photographic arrays shown to them by the police.  Sharif and Young also identified [Petitioner] and Simmons as the shooters at trial.  In addition, although he did not witness the shooting, Gibbs identified [Petitioner] as the person who had the altercation with Phelps and was escorted out of the bar.

Neither [Petitioner] nor Simmons testified or presented any other witnesses in their defense.

*State v. Venable*, 986 A.2d 743, 744-45 (N.J. App. Div.), *certif. denied*, 997 A.2d 231 (N.J.

2010).

During jury selection prior to trial and following a discussion of the potential gang affiliation testimony that might come out during the course of trial, the trial court in this matter made the following remarks:

> Are there individuals here from either the defense'[s] family or the victim's family because if so I don't want anybody from either family in the courtroom during jury selection because we're going to have 85 jurors, and the courtroom is just going to be too crowded. I don't, for security reasons, I don't want members of the defendant's family or the victim's family in the courtroom during jury selection.

*Id.* at 745-46.   Petitioner's trial counsel responded to this order by saying, "Oh, okay.   No problem," and his co-defendant's lawyer did not respond in any way.   *Id.* at 746.   No objection was made to this temporary closure of the court room as to the families only, and there is nothing in the record which clearly demonstrates that any such family members were present in the court room at that time.   *Id.*   (*See also* Document 5 attached to ECF No. 9 at 4-19).

At trial, several witnesses identified Petitioner as either one of the shooters or the person who was involved in an altercation with the victim inside of the night club prior to the shooting. Because one of Petitioner's challenges relates to this identification testimony, a brief summary of the testimony regarding those identifications is necessary for the purposes of this opinion.   At trial, Sharif Phelps, the victim's brother, testified that he broke up a fight between his brother and another individual, whom he identified as Petitioner.   (Document 7 attached to ECF No. 9 at 40-41).   Phelps also testified that Petitioner was with his co-defendant, whom Phelps had known for several years.   (*Id.* at 41).   He further stated that when he, his cousin, and the victim left the club at closing time, Phelps heard several gunshots, and turned to see Petitioner and his co-defendant with guns in their hands, and his brother upon the ground having been shot.   (*Id.* at

3

43).   He then witnessed Petitioner continuing to shoot his brother.   (*Id.*).   Phelps stated that the

area was well lit, and that he got a good look at Petitioner and his co-defendant during the

shooting and that he was certain that Petitioner was both the shooter and the man who had fought

with his brother in the club.   (*Id.* at 45-46).

Phelps also testified about his having made prior identifications of Petitioner and his co-

defendant.   Phelps testified that, following the shooting, he made a statement at the Irvington

police station and identified Petitioner's co-defendant by name as one of the two shooters,

ultimately picking him out of a photo array a couple of hours later.   (*Id.* at 48-49).   Phelps

further testified that, a few days later on November 29, 2004, he went to the prosecutor's office

to look through a series of photos via computer.   (*Id.* at 50-51).   During this session, Phelps

identified Petitioner's photograph, immediately stating to the detective that "this is the

motherfucker right here" upon seeing Petitioner's photo.   (*Id.* at 51).   Phelps also testified that,

during the array, he had been told only to tell the detective if he recognized anyone, and was not

directed to pick someone out.   (*Id.*).

Detective Bzik, the lead detective in this matter, eventually testified that, when they were

having difficulty identifying the second shooter, later identified as Petitioner, she brought Phelps

into her office to review a computer database of photographs.   (Document 9 attached to ECF

No. 9 at 90).   She then testified that she entered into the computer the description Phelps had

given and let Phelps go through the pictures, but Phelps could not identify anyone.   (*Id.*).   She

then adjusted the description, changing the skin tone from light to medium, and had Phelps again

look through photos.   (*Id.* at 90-91).   During this second viewing, Petitioner's photo eventually

appeared, at which point Phelps stood up, "spit on the screen, and he yelled, that motherfucker,

4

and became extremely upset." (*Id.* at 91).  Bzik then printed the photo of Petitioner, and placed it into a photo array with several photos of other individuals with similar characteristics.  (*Id.* at 91-92).  To be certain that Phelps had not identified based on his tattoos, Bzik covered the areas where Petitioner had tattoos on all six photos with a black marker, so that all of the photos in the array appeared similar in that respect.  (*Id.* at 92). She then had another detective named Frisk show that array to Phelps, at which point he again identified Petitioner as the one who shot his brother.  (*Id.* at 93).

After Phelps's testimony concluded, the State next called a detective Gregory, who testified regarding his having shown Phelps the original photo array.   Gregory testified that on the night of the shooting, he was not involved with the investigation, and was thus chosen to show Phelps the initial photo array.   (Document 7 attached to ECF No. 9 at 100).   Gregory further testified that he gave Phelps the standard instructions for reviewing a line up, in which he informed Phelps that he did not know who the suspects were, and that it was for the witness to identify anyone he recognized in the array.   (*Id.* at 100-01).   Gregory testified that Phelps, without further direction or help, identified Petitioner's co-defendant.   (*Id.* at 102).

The State then called Tashon Young, the victim's cousin.   Young also identified Petitioner as the person who argued with the victim in the club, and as one of the shooters.  (*Id.* at 107-110).   Young testified that he had a good opportunity to view Petitioner and his co-defendant, from a short distance away in decent lighting on that evening.   (*Id.* at 110-12). Young also testified to his having identified both Petitioner and his co-defendants during photo arrays, and that he was absolutely certain that they were the ones who shot his cousin.   (*Id.* at 113-18).

5

Detective Frisk of the county prosecutor's office next testified regarding the photo array in which Phelps identified Petitioner following his initial identification of Petitioner on a computer screen discussed above.   Frisk testified that he was not involved in the investigation of the shooting, but was asked by the detective investigating the case to conduct the November 29th photo array with Phelps.   (Document 8 attached to ECF No. 9 at 39-40).   Frisk stated that he gave Phelps the standard instructions and showed Petitioner the array, and that he did not know anything about the case or the suspects involved in this case.   (*Id.* at 40).   Frisk further testified that he and Phelps were the only ones present at that time.   (*Id.* at 41).   Frisk then testified that Phelps identified Petitioner, stating that he was the one who shot his brother upon seeing Petitioner's photograph.   (*Id.* at 42-43).

Detective Kyle Jackson of the prosecutor's office then testified regarding the photo array he conducted for Tashon Young.   Jackson testified that he gave Young the standard instructions, including an instruction that the perpetrator may not be in the array.   (*Id.* at 45-46).   Jackson also stated that he had no involvement in this case, and thus did not know anything about the individuals in the array.   (*Id.* at 46).   Jackson testified that Young then identified Petitioner without hesitation upon seeing his picture.   (*Id.* at 46-47).   Detective Wallace of the Irvington police, who was also not involved in this case, later testified that Young similarly identified Petitioner's co-defendant during an earlier photo array.   (Document 9 attached to ECF No. 9 at 65).

A third witness, an employee of the night club named Gibbs, also identified Petitioner as the man who argued with the victim inside the club before the shooting via photo array and during the trial.   (Document 9 attached to ECF No. 9 at 44-45).   Gibbs had not been able to

identify Petitioner's co-defendant, however.   (*Id.* at 46).   Detective Homes, who conducted the

array with Gibbs but was otherwise uninvolved, also testified regarding Gibbs's identification of

Petitioner.   (*Id.* at 70).   Holmes testified that, after viewing the array, Gibbs was certain that the

photograph of Petitioner was the individual who was involved in the club altercation with the

witness.   (*Id.* at 71).

Following all of the testimony at trial, Petitioner and his co-defendant were convicted of

purposeful or knowing murder and related weapons charges.   *Venable*, 986 A.2d at 744.

Petitioner appealed his conviction and sentence, and the New Jersey Appellate Division

affirmed.   *Id.*[1]  Petitioner filed a petition for certiorari, which the New Jersey Supreme Court

ultimately denied.   997 A.2d at 231.

Following the conclusion of direct appeal, Petitioner and his co-defendant both filed

petitions for post-conviction relief, which were denied by the trial courts.   *See State v. Simmons*,

2014 WL 6677148, at *1 (N.J. App. Div. Nov. 26, 2014).   Petitioner also filed a motion for a

new trial based on allegedly newly discovered evidence alongside his petition.   *Id.*at *2.   That

motion was based on a certification provided by an individual known as Q, also known as

Laquan Jordan.   In his certification, Q stated that he was at the club on the night of the shooting

with the victim and his brother.   *Id.*   Q further asserted that, at the time of the shooting, he and

Sharif Phelps were not near the site of the shooting as they were at his car.   *Id.*   Q states that the

two ran to the scene, discovered the victim and Tashon Young, and asked Young what had

---

[1]  Only a portion of the Appellate Division's opinion affirming Petitioner's conviction was
published.   The remainder was presented in an unpublished opinion.   *See State v. Venable*,
2010 WL 32980 (N.J. App. Div. Jan. 29, 2010).

happened, to which Young responded he didn't know as he had run from the shots. *Id.* Q did not assert that he had seen who shot the victim, nor that the shooter was not Petitioner, and thus only offered impeachment evidence challenging the testimony of Phelps and Young that Petitioner was the shooter. *Id.* This information, however, was offered by Q for the first time in 2010, several years after trial. *Id.* Q asserted that, upon learning the length of Petitioner's sentence, he decided to come forward because he "knew" that Phelps and Young had not seen the shooter. *Id.* Q also claimed that he never discussed the case with Phelps. *Id.*

The PCR court denied the motions of both Defendants, finding that their claims of ineffective assistance were without merit, and that Q's certification was insufficient to warrant a new trial as it offered only impeachment evidence, and that that impeachment evidence would not have produced a different jury result had it been provided at trial in light of the multiple eyewitnesses at trial all of whom identified Petitioner as either the shooter or the person who argued with the victim. *Id.* at *3-4. Petitioner and his co-defendant appealed, and the New Jersey Appellate Division affirmed the denial of their PCR motions and the motion for a new trial. *Id.* Petitioner petitioned for certification, and the New Jersey Supreme Court denied his petition on April 30, 2015. *State v. Venable*, 112 A.3d 593 (N.J. 2015). Petitioner thereafter filed this habeas petition.

## II.   DISCUSSION

### A.   Legal Standard

Under 28 U.S.C. § 2254(a), the district court "shall entertain an application for a writ of habeas corpus [o]n behalf of a person in custody pursuant to the judgment of a State court only on

the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."   A habeas petitioner has the burden of establishing his entitlement to relief for each claim presented in his petition based upon the record that was before the state court.   *See Eley v. Erickson*, 712 F.3d 837, 846 (3d Cir. 2013); *see also Parker v. Matthews*, --- U.S. ---, ---,132 S. Ct. 2148, 2151 (2012).   Under the statute, as amended by the Anti-Terrorism and Effective Death Penalty Act, 28 U.S.C. § 2244 ("AEDPA"), district courts are required to give great deference to the determinations of the state trial and appellate courts.   *See Renico v. Lett*, 559 U.S. 766, 772-73 (2010).

Where a claim has been adjudicated on the merits by the state courts, the district court shall not grant an application for a writ of habeas corpus unless the state court adjudication

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).   Federal law is clearly established for these purposes where it is clearly expressed in "only the holdings, as opposed to the dicta" of the opinions of the United States Supreme Court.   *See Woods v. Donald*, --- U.S. ---, ---, 125 S. Ct. 1372, 1376 (2015). "When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong."   *Id.*   Where a petitioner challenges an allegedly erroneous factual determination of the state courts, "a determination of a factual issue made by a State court shall be presumed to be correct [and the] applicant shall have the burden of rebutting

the presumption of correctness by clear and convincing evidence."   28 U.S.C. § 2254(e)(1).

## B.   Analysis

### 1.   Petitioner's Public Trial Claim

Petitioner's chief claim is that the trial court denied him his right to a public trial by ordering that the family members of Petitioner and the victim be removed from the court room during jury selection.   This Order, Petitioner contends, is a structural error requiring reversal of his conviction, and as a result the State Court's denial of his public trial claim is contrary to the Supreme Court's ruling in *Presley v. Georgia*, 558 U.S. 209 (2010).   As the Third Circuit has explained,

> [i]n general, the denial of a defendant's right to a public trial is a "structural error"—i.e. a defect "affecting the framework within which the trial proceeds"—requiring reversal irrespective of whether the defendant demonstrates the error prejudiced his substantial rights.  *See Arizona v. Fulminante*, 499 U.S. 279, 310[] (1991) (canvassing cases and delineating the scenarios in which structural errors have been recognized).  "It does not necessarily follow, however, that every deprivation in a category considered to be 'structural' constitutes a violation of the Constitution or requires reversal of the conviction, no matter how brief the deprivation or how trivial the proceedings that occurred during the period of deprivation."  *Gibbons v. Savage*, 555 F.3d 112, 120 (2d Cir.2009), *cert. denied*, ––– U.S. ––––, 130 S. Ct. 61, 175 L.Ed.2d 233 (2009).  That is, "not every improper partial closure implicates [Sixth Amendment] concern[s]."  *Brown v. Kuhlmann*, 142 F.3d 529, 536 (2d Cir.1998); *see also Bowden v. Keane*, 237 F.3d 125, 129 (2d Cir.2001) (explaining that a defendant's right to a public trial "is not trammeled, for example, by a trivial, inadvertent courtroom closure"); *Braun v. Powell*, 227 F.3d 908, 919 (7th Cir.2000) (holding the exclusion of one spectator from an entire trial "does not implicate the policy concerns that inform the Sixth Amendment's right to an open trial").

Whether a particular closure abridges a defendant's Sixth Amendment rights hinges on its potential to undermine the values advanced by the public trial guarantee, which include (1) ensuring a fair trial; (2) reminding the government and the judge "of their responsibility to the accused and the importance of their functions"; (3) encouraging witnesses to come forward; and (4) discouraging perjury. *Peterson v. Williams*, 85 F.3d 39, 43 (2d Cir.1996). In *Peterson*, for example, the Second Circuit held a closure that was "1) extremely short, 2) followed by a helpful summation, and 3) entirely inadvertent" did not, in that instance, violate a defendant's Sixth Amendment rights. 85 F.3d at 44. Additionally, "the exclusion of a family member or friend may, in rare circumstances ..., not implicate the Sixth Amendment public trial guarantee." *Carson v. Fischer*, 421 F.3d 83, 94 (2d Cir.2005); *see also United States v. Perry*, 479 F.3d 885, 890–91 (D.C.Cir.2007) (finding a district court's exclusion of the defendant's son to be a trivial closure insufficient to raise constitutional concerns).

Courts have continued to conduct triviality analyses in the wake of *Presley*'s holding that the Sixth Amendment extends to voir dire proceedings. In *Barrows v. United States*, 15 A.3d 673, 680–81 (D.C. 2011), the Court of Appeals for the District of Columbia affirmed a conviction after concluding a "brief closure of the courtroom during voir dire " had not "seriously compromised the fairness or integrity of [the defendant's] trial." And in *Kelly v. State*, []6 A.3d 396 (2010), the Maryland Court of Special Appeals considered the following factors determinative in holding a closure to have been de minimus:

> (1) the limited duration of the closure, two to three hours during voir dire;
>
> (2) that the closure did not encompass the entire proceedings of voir dire and jury selection, and that a significant portion of the proceedings during that time were not even audible to spectators in the courtroom; and (3) that the closure was a partial one [that encompassed only members of the defendant's family], and not a total exclusion of all spectators."

*Id.* at 411.

Moreover, courts have placed considerable emphasis on the

11

> role of the trial judge in assessing whether a closure is of constitutional magnitude and have resisted ascribing to judges the unauthorized actions of courthouse personnel. The Tenth Circuit has held that a defendant may not mount a successful Sixth Amendment claim in the absence of "some affirmative act by the trial court meant to exclude persons from the courtroom." *United States v. Al–Smadi*, 15 F.3d 153, 154 (10th Cir.1994); *see also id.* at 154–55 ("The brief and inadvertent closing of the courthouse and hence the courtroom, unnoticed by any of the trial participants, did not violate the Sixth Amendment."). The Fourth Circuit found a bailiff's temporary refusal to allow members of the public into the courtroom "entirely too trivial to amount to a constitutional deprivation" when it "existed for but a short time and was quickly changed by the Court, when advised of the action of the bailiff." *Snyder v. Coiner*, 510 F.2d 224, 230 (4th Cir.1975). By contrast, when a trial judge is initially unaware of a closure but subsequently ratifies actions taken by courthouse personnel to limit access to the courtroom, such "ex-post approval" is sufficient to trigger constitutional considerations. *United States v. Smith*, 426 F.3d 567, 572 (2d Cir. 2005).

*United States v. Greene*, 431 F. App'x 191, 194-96 (3d Cir. 2011).

The Court first notes that the closure of the Court room was very limited in scope and duration – it applied only to the family members of Petitioner, his co-defendant, and the victim, and only during jury selection. It must likewise be noted that Petitioner's attorney was not opposed to the order directing the family members to leave the court room, instead stating his acceptance of the order, with Petitioner's co-defendant's counsel also failing to object. The Court also notes, as did the New Jersey Appellate Division, that the record is unclear as to whether any of Petitioner's family or the victim's family were actually present in the court room at the time of the order, and there is thus nothing in the record indicating that anyone who actually wished to attend jury selection was in any way barred from doing so. It is clear, however, that the closure in no way prevented members of the general public from viewing jury selection and, indeed, the

remainder of trial.   Given these facts, it is doubtful that the closure in this case would be sufficient

to undermine the values presented by the public trial right, and in turn it is doubtful that this closure

could be said to truly impugn Petitioner's Sixth Amendment rights.   *Greene*, 431 F. App'x at 195-

96.

Even if the closure here could be said to be violative of the Sixth Amendment to some

extent, Petitioner's claim is essentially without merit for two reasons.   First, counsel's failure to

object to the closure, and, indeed, assent thereto, essentially amounts to a waiver of Petitioner's

right to have the family members present pursuant to the public trial guarantee of the Sixth

Amendment, *see Visciotti v. Martel*, --- F.3d ---, ---, 2016 WL 606814 (9th Cir. 2016) (citing

*Levine v. United States*, 362 U.S. 610, 619-20 (1960), for the proposition that a defendant may

waive his right to a public trial); *Addai v. Schmalenberger*, 776 F.3d 528, 534 (8th Cir. 2015)

(criminal defendant may waive his right to a public trial); *United States v. Whalen*, 578 F. App'x

533, 539 (6th Cir. 2014) (counsel can waive a defendant's right to a public trial by consenting to

a limited closure of the court room); *United States v. Cockerham*, 397 F. App'x 944, 945 (5th Cir.

2010) (failure to object to closure of court room by defendant or counsel amounts to waiver of

right to challenge violation of right to a public trial) (citing *United States v. Hitt*, 473 F.3d 146,

155 (5th Cir. 2006); *United States v. Sorrentino*, 175 F.2d 721, 723 (3d Cir. 1949)); *Guyton v.

Butler*, 490 F. App'x 331, 332 (11th Cir. 2012) ("[n]o clearly established Supreme Court precedent

holds that a defendant cannot waive the right to a public trial, nor that the court must balance the

interests of closure absent an objection").   Thus, because Petitioner's counsel essentially agreed

to the trial court's order directing the families of the victim and Petitioner to leave the room for

lack of space during jury selection, Petitioner is deemed to have waived his right to a public trial

to the extent that that right was impugned by the brief closure at issue here.

Second, and more importantly, even in the post-*Presley* world, an alleged violation of a criminal defendant's right to a public trial can be rejected where the violation asserted was too trivial to fundamentally affect his rights. *Greene*, 431 F. App'x at 194-96. Here, as noted above and in the Appellate Division's opinion on direct appeal, the trial closure asserted was relatively brief – only occurring during a portion of jury selection due to space and, potentially, safety concerns, and was limited only to the family of the victim and the defendants. Nothing in the record suggests that any of those people were actually in the court room at the time, or that they wished to attend but were denied the opportunity to do so. Instead, the measure appears to have been made in the abstract. Thus, it is not clear that any individuals who wished to view Petitioner's trial, be they family or otherwise, were actually barred from entering the jury selection proceedings. It therefore fully appears that this brief and limited closure did not in any way impugn the interests inherent in the public trial right – that Petitioner receive a fair trial, that the prosecutor and judge be made aware of their responsibilities to the parties and the public, encouraging witnesses to come forward, and dissuading perjury. *Id.* Given these facts, this Court concludes, as did the Appellate Division, that the closure involved in this case was entirely too trivial to impugn Petitioner's right to a public trial. *Id.* As such, the rulings of the state courts were not contrary to nor involved unreasonable applications of applicable Supreme Court precedent, and Petitioner's public trial claim is therefore insufficient to warrant habeas relief.

**2. Petitioner's "New evidence" Claim**

Petitioner next claims that the state courts improperly denied his motion for a new trial based on allegedly newly discovered evidence based on Laquan Jordan's 2010 certification. The State courts denied Petitioner's motion under the standard set forth in *State v. Ways*, 850 A.2d 440 (N.J. 2004). As the New Jersey Supreme Court explained in *Ways*, in order to warrant a new trial on a motion for a new trial or a PCR petition based on a claim of newly discovered evidence, the "defendant must show that the evidence is 1) material, and not merely cumulative, impeaching, or contradictory; 2) that the evidence was discovered after completion of the trial and was not discoverable by reasonable diligence beforehand; and 3) that the evidence would probably change the jury's verdict if a new trial were granted." *Id.* at 449 (internal quotations omitted); *see also State v. Carter*, 426 A.2d 501, 508 (N.J. 1981). This standard mirrors that applied in federal courts pursuant to Rule 33 for motions for a new trial brought by federal prisoners. *See, e.g., United States v. Cimera*, 459 F.3d 452, 458 (3d Cir. 2006) (motion for new trial based on newly discovered evidence requires that defendant prove that the evidence is newly discovered since the conclusion of trial, there is evidence that he was diligent, the evidence is not merely cumulative or impeaching, the new evidence is material to the issues involved in his trial, and that the evidence is so strong that, had it been admitted at trial, it probably would have produced an acquittal).

In this case, the PCR court and Appellate Division both rejected Petitioner's new trial claim because the evidence offered by Q's certification was entirely limited to impeachment evidence, and, despite arguably being newly discovered evidence, that evidence was insufficient to show that the verdict at Petitioner's trial would have been different had Q so testified. In reaching that decision, the State courts explained as follows:

15

> [t]he State provided two eyewitnesses who identified defendants, one of whom knew [Petitioner's co-defendant] for years. They produced several other witnesses who identified defendants by clothing, description, and/or facial tattoo. All of them had ample opportunity to observe. None of these witnesses were damaged significantly on cross[-]examination. Several did not have any bias toward or against defendants, and were truly independent.

*Simmons*, 2014 WL 6677148 at *4, *6. Nothing in the State courts' decisions appears to be based on an unreasonable determination of the facts. Laquan Jordan's certification provides nothing more than impeachment evidence which would have contradicted the testimony of two eyewitnesses. As the State courts noted, there were two additional eyewitnesses who also identified Petitioner as the person who argued with the victim in the club, although they did not see the shooting. Both of the individuals who Laquan Jordan could have impeached were largely consistent with each other, and both identified Petitioner and his co-defendant as the shooters despite being shown arrays separately and at different times. In light of the eyewitness testimony, and the broad stroke consistency between the testimony of Phelps, Young, and the club employees, it is extremely doubtful that Laquan Jordan's purported testimony would have changed the result at trial. Given that fact, and the fact that Jordan's testimony provides no more than impeachment evidence, Petitioner's motion for a new trial fails not only under the test set forth in *Ways*, but also would fail were it considered under the federal analogue standard under Rule 33. Thus, there does not appear to have been any error in the state courts' rejection of Petitioner's motion for a new trial. As Petitioner has otherwise failed to argue, let alone show that the state courts' decisions were contrary to or an unreasonable application of any clearly established federal law, and as those decisions were clearly not based on an unreasonable application of the facts, Petitioner has failed to show that he is entitled to habeas relief on this basis.

### 3.   Petitioner's Ineffective Assistance of Counsel Claims

Petitioner raises several claims in which he asserts he received ineffective assistance of counsel.   The standard which governs such claims is well established:

> [c]laims of ineffective assistance are governed by the two-prong test set forth in the Supreme Court's opinion in *Strickland v. Washington*, 466 U.S. 668 (1984).   To make out such a claim under *Strickland*, a petitioner must first show that "counsel's performance was deficient.   This requires [the petitioner to show] that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* at 687*; see also United States v. Shedrick*, 493 F.3d 292, 299 (3d Cir. 2007). To succeed on an ineffective assistance claim, a petitioner must also show that counsel's allegedly deficient performance prejudiced his defense such that the petitioner was "deprive[d] of a fair trial . . . whose result is reliable." *Strickland*, 466 U.S. at 687; *Shedrick*, 493 F.3d at 299.
>
> In evaluating whether counsel was deficient, the "proper standard for attorney performance is that of 'reasonably effective assistance.'" *Jacobs v. Horn*, 395 F.3d 92, 102 (3d Cir. 2005).   A petitioner asserting ineffective assistance must therefore show that counsel's representation "fell below an objective standard of reasonableness" under the circumstances. *Id.*   The reasonableness of counsel's representation must be determined based on the particular facts of a petitioner's case, viewed as of the time of the challenged conduct of counsel. *Id.*   In scrutinizing counsel's performance, courts "must be highly deferential . . . a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.
>
> Even where a petitioner is able to show that counsel's representation was deficient, he must still affirmatively demonstrate that counsel's deficient performance prejudiced the petitioner's defense. *Id.* at 692-93.   "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693.   The petitioner must demonstrate that "there is a reasonable probability, but for counsel's unprofessional

17

errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694; *see also Shedrick*, 493 F.3d at 299. Where a "petition contains no factual matter regarding *Strickland's* prejudice prong, and [only provides] . . . unadorned legal conclusion[s] . . . without supporting factual allegations," that petition is insufficient to warrant an evidentiary hearing, and the petitioner has not shown his entitlement to habeas relief. *See Palmer v. Hendricks*, 592 F.3d 386, 395 (3d Cir. 2010). "Because failure to satisfy either prong defeats an ineffective assistance claim, and because it is preferable to avoid passing judgment on counsel's performance when possible, [*Strickland*, 466 U.S. at 697-98]," courts should address the prejudice prong first where it is dispositive of a petitioner's claims. *United States v. Cross*, 308 F.3d 308, 315 (3d Cir. 2002).

*Judge v. United States*, 119 F. Supp. 3d 270, 280-81 (D.N.J. 2015).


### a. Petitioner's Identification Related Claim

Petitioner first asserts that trial counsel proved ineffective in failing to request a hearing pursuant to *United States v. Wade*, 388 U.S. 218 (1967), in order to challenge the identifications of Petitioner made by the victim's brother and cousin. In order to show that he was prejudiced by counsel's failure to request a *Wade* hearing, he "must show that he would likely have prevailed on [his] suppression motion and that, having prevailed, there is a reasonable likelihood that he would not have been convicted." *Thomas v. Varner*, 428 F.3d 491, 502 (3d Cir. 2005). The standards governing the admissibility of out of court identifications were set in the Supreme Court's opinion in *Manson v. Brathwaite*, 432 U.S. 98, 116 (1977). In *Manson*, the Supreme Court held that an identification will violate due process and suppression will potentially be warranted where the procedure used by the police to produce the identification was "unnecessarily suggestive and . . . create[d] a substantial risk of misidentification." *United States*

18

*v. Brownlee*, 454 F.3d 131, 137 (3d Cir. 2006); *see also United States v. Anthony*, 458 F. App'x 215, 218 (3d Cir. 2012).   Suggestive procedures alone, however, will not warrant suppression of an out of court identification, as "reliability is the linchpin in determining the admissibility of identification testimony . . . The factors to be considered [in determining whether an identification is reliable enough to be admitted] include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation.   Against these factors is to be weighed the corrupting effect of the suggestive identification itself."   *Anthony*, 458 F. App'x at 218 (quoting *Manson*, 432 U.S. at 114).

In this matter it is clear that, even had counsel requested a *Wade* hearing, the identifications in question would not have been suppressed and the outcome of Petitioner's trial would not have changed.   Here, Petitioner presents little other than speculation to suggest that the identifications in this case were in any way subject to suggestive procedures.   The testimony provided at trial, however, indicates that the opposite is true – that the police used standard recommended procedures which were not in any way suggestive as to all of the photo arrays used.   The only showing of photographs that could in any way be said to have been less than ideal was Phelps's identification of Petitioner while viewing random photographs based on his description of the shooter.   The testimony at trial, however, suggests that this was done for lack of leads, and that although this process was conducted by the investigator involved in this case, the detective could not have known that Petitioner was part of the array, or was in fact the shooter.   Instead, the testimony indicates that Petitioner viewed many photos and identified no one, but when

19

Petitioner's photo finally appeared after an adjustment to the skin color setting on the computer, Phelps immediately identified him.   Detective Bzik then took him to another room, calmed him down, and had another, uninvolved detective show Petitioner another photo array which was adjusted to prevent any contamination resulting from Petitioner's tattoos.   All told, this procedure does not appear to have been unduly suggestive, and thus it is doubtful that a *Wade* hearing would have been granted if requested.

Even if such a hearing had been granted, however, it is clear that the identifications in this case were all more than sufficiently reliable to ensure their admissibility.   All of the witnesses who identified Petitioner testified that they had ample opportunity to observe Petitioner from fairly short distances in decent lighting, and were certain that he was the person either involved in the altercation in the club or was the shooter in this case.   All of these facts clearly indicate that the identifications in this case were more than sufficiently reliable to be admissible even if this Court were inclined to find Bzik's showing of the computer photos in some way suggestive.   The identifications would thus have been admissible at trial even if Petitioner's counsel had secured a *Wade* hearing, and thus it is clear that the outcome of Petitioner's trial would have been no different.   Petitioner's *Wade* related ineffective assistance claim is thus without merit.   *Thomas*, 428 F.3d at 502.

**b.   Petitioner's Alias Related Ineffective Assistance Claim**

Petitioner also asserts that counsel was ineffective in agreeing to a stipulation as to Petitioner's alias.   The parties in this matter agreed to a stipulation that Petitioner was also known by the name Rakhil Shakyer.   (*See* Document 8 attached to ECF No. 9 at 39).   That stipulation

was necessary because several of the photographs of Petitioner which were used during the photo arrays were identified in the police databases as belonging to the Shakyer alias rather than to Petitioner's actual name.   Thus, it is clear that the alias was relevant to the testimony in the case as it explained that Shakyer and Petitioner were one and the same, and by admitting this fact via stipulation, counsel avoided any testimony which may have led to speculation as to why Petitioner made use of this alias.   Given the lack of any testimony suggesting that this alias was indicative of a criminal history, the stipulation does not appear to have prejudiced Petitioner in any way.   As such, Petitioner cannot show that he was prejudiced by counsel's agreement to the stipulation. Because Petitioner cannot show that the result of trial would have been different absent the stipulation, he cannot show *Strickland* prejudice and as such his ineffective assistance of counsel claim based on the alias is without merit.

Petitioner also attempts to argue that he was denied a fair trial by the admission of his alias into evidence.   Petitioner provides little other than speculation to support this assertion.   Because habeas relief is not available for state law errors, and because evidentiary rules are largely a creature of state law, the allegedly erroneous admission of evidence, such as Petitioner's alias, at trial will not support a habeas claim unless that admission was so erroneous that it could be said to amount to a violation of Due Process.   *See Estelle v. McGuire*, 502 U.S. 62, 67-70 (1991); *see also Wilson v. Vaughn*, 533 F.3d 208, 213-14 (3d Cir. 2008), *cert. denied*, 556 U.S. 1170 (2009); *Keller v. Larkins*, 251 F.3d 408, 413, 416 n.2 (3d Cir.), *cert. denied*, 534 U.S. 873 (2001).   A state evidentiary ruling will only rise to that level where the error in question was so grave or pervasive that it denied Petitioner a fundamentally fair trial.   *Keller*, 251 F.3d at 413.

It is clear that the admission of Petitioner's alias did not deprive him of a fair trial. As discussed above, the alias was relevant insomuch as it explained the disparity in names associated with the various photos of Petitioner used in the photo arrays, and, given the lack of any testimony suggesting the alias was somehow the result of criminality, does not appear to have been prejudicial. Petitioner provides nothing more than his own assertion that his having the Shakyer alias in any way suggested that he was guilty, and nothing in the record supports that assertion. Nothing in the record suggests that the admission of the alias via stipulation deprived Petitioner of a fundamentally fair trial, and as such the admission of the alias does not amount to a Due Process violation, and Petitioner is thus not entitled to habeas relief on that basis. *Id.*

Petitioner also challenges the admission of a second pseudonym that he gave to the Virginia police when they stopped him for a moving violation. This second name, Rasheed Rosier, came into evidence when Detective Bzik testified about her attempts to locate Petitioner to arrest him, ultimately resulting in his being apprehended in Virginia during a motor vehicle stop. Petitioner contends that the admission of his giving a pseudonym to Virginia police served no purpose other than to suggest his guilt. Consciousness of guilt in the form of flight, of course, was the exact reason that Petitioner's arrest in Virginia was admitted into evidence, and that incident, including the giving of a false name, ultimately formed the basis for a flight charge. Despite the flight charge, it is clear that, given the considerable eye-witness testimony identifying Petitioner as the shooter, the result of Petitioner's trial would not have been different had the Virginia incident not been admitted into evidence, and that any error in admitting the second alias would therefore have been harmless. *See Fry v. Piller*, 551 U.S. 112, 116 (2007) (on collateral review, errors of even a constitutional dimension will be considered "harmless unless [they] had a substantial and

injurious effect or influence in determining the jury's verdict"); *see also Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993).   As the admission of this testimony was ultimately harmless, it cannot form the basis for habeas relief even if this Court were to assume that some error had occurred. Thus, none of Petitioner's alias related claims entitle him to relief, whether considered independently or as the basis for an ineffective assistance of counsel claim.

In a related claim, Petitioner also asserts that counsel was ineffective in failing to oppose the state's request for a flight charge based on Petitioner's arrest in Virginia.   Petitioner also suggests counsel failed to adequately oppose the admission of his Virginia arrest photograph and alleged hearsay testimony from Detective Bzik regarding Petitioner's arrest in Virginia.   Initially, the Court notes that counsel did, in fact, oppose the flight charge, arguing that Petitioner's presence outside of New Jersey was not indicative of his flight or an attempt to avoid apprehension.   (*See* Document 10 attached to ECF No. 9 at 23-24).   The trial court rejected that argument, finding the question of whether Petitioner's presence in Virginia constituted flight was a question for the jury to decide.   Thus, counsel certainly could not be said to have failed to oppose the flight charge. Ultimately, given the eyewitness testimony in this case and the relative unimportance of the flight charge's permitting the jury to consider Petitioner's flight, if flight they found it to be, indicative of cognizance of guilt in this case, this Court concludes that Petitioner has failed to show that he was prejudiced by the flight charge, or the admission of the information regarding his being arrested in Virginia, including the alleged hearsay and Petitioner's mug shot which led to that charge.   This Court concludes that even if that information been stricken and not considered by the jury, there is no reasonable likelihood that the jury would have reached a different result given

the eyewitness testimony in this case, and as such Petitioner did not suffer *Strickland* prejudice. He has thus failed to show ineffective assistance of counsel as to these claims as well.

### c.  Petitioner's Manslaughter charge related claim

Petitioner also asserts that his attorney was ineffective in failing to request that the jury be provided a passion/provocation manslaughter charge as a potential lesser included offense.   Under New Jersey law, a trial court "'shall not charge the jury with respect to an included offense unless there is a rational basis' to convict a defendant of [that] lesser included offense."   *State v. Savage*, 799 A.2d 477, 491 (N.J. 2002) (quoting N.J. Stat. Ann. § 2C:1-8(e)).   Passion-provocation manslaughter, which is a lesser included offense of murder, has the following elements:   "(1) reasonable and adequate provocation; (2) no cooling-off time in the period between the provocation and the slaying; (3) a defendant who actually was impassioned by the provocation; and (4) a defendant who did not cool off before the slaying."   *State v. Josephs*, 803 A.2d 1074, 1109 (N.J. 2002).   Generally, "words alone, no matter how offensive or insulting, do not constitute [sufficient] provocation."   *State v. Crisantos*, 508 A.2d 167, 171 (N.J. 1986).

In this case, the facts adduced at trial do not provide any basis for a passion-provocation manslaughter charge.   As the defense itself highlighted, the testimony at trial indicated only that the victim and Petitioner got into an argument inside of the club, that the two exchanged heated words, and were then promptly separated by the club staff, with Petitioner and his co-defendant being escorted out and the victim being escorted to the bathroom so all would have an opportunity to calm down.   Several minutes then passed before the victim left the club, only to be shot once outside.   According to the defense theory of the case, it was persons unknown who did that

shooting, whereas Petitioner and his co-defendant were found to be the shooters by the jury. Given these facts, even viewed in a light most favorable to Petitioner, there was no basis for a passion provocation charge.   The only "provocation" here was the heated exchange of words between Petitioner and the victim in the club, which are legally insufficient to constitute sufficient provocation. *Crisantos*, 508 A.2d at 171.   Likewise, there was ample time for cooling off – the two were separated and then Petitioner was calmly escorted out of the club by club staff, and some time passed between his being escorted out and the victim exiting the club at closing time. Because there was no reasonable and adequate provocation, and because there was ample cooling off time according to the testimony provided at trial, there was no factual basis for a passion-provocation manslaughter charge in this matter.   As such, any request by counsel for such a charge would have been futile, and the failure to request the charge cannot be considered ineffective assistance of counsel.   Indeed, a passion-provocation charge would have flown in the face of counsel's entire defense strategy – to argue that Petitioner had no reason to shoot the victim, had left before the shooting, and that the police failed to locate the real killers and simply placed the blame on Petitioner based on the brief and innocuous argument between the two in the club. Ultimately, it is clear that there was no basis for the manslaughter charge and that counsel was therefore not ineffective in failing to request that charge.

**d.   Petitioner's "gang" language related claim**

Petitioner also argues that counsel was ineffective in failing to discern the importance of the gang-related meaning of the phrase "what's crackin, what's poppin," which he claims would have supported a passion/provocation manslaughter charge.   Petitioner, however, utterly fails to

25

explain how that language somehow shows that he was strongly provoked, or what meaning that phrase has in this context.   There is nothing in the record to suggest that the jury had any reason to conclude that this phrase was a provocation or had some hidden gang-related meaning, indeed, defense counsel used the testimony about this phrase to suggest that Petitioner was not the shooter because it was insufficient to give him any reason to shoot the victim.   Given the relatively innocuous nature of the phrase, and the lack of anything in the record to suggest some hidden, darker meaning for the phrase, it is difficult to imagine what relevance it would have had to Petitioner's passion/provocation argument.   As Petitioner has utterly failed to explain how this alleged secret meaning for the phrase affected his trial, he has failed to show that he was in any way prejudiced by counsel's alleged failure to understand the hidden meaning of "what's crackin, what's poppin" and has thus failed to show that he suffered ineffective assistance of counsel as a result.   *Palmer*, 592 F.3d at 395 (vague allegations as to *Strickland* prejudice insufficient to warrant habeas relief).

### e.  Petitioner's inconsistency related claim

Petitioner's final ineffective assistance of counsel argument asserts that counsel failed to capitalize on the inconsistencies between the various eye witnesses' versions of events on the night of the shooting, and thus failed to adequately defend him.   This assertion is patently without merit and completely contradicted by the record.   In his summation, counsel focused on two points – the poor investigation conducted by Irvington police, and the inconsistencies between the testimony of Phelps and Young and the allegedly more reliable testimony of the club employees who counsel asserted had no dog in the fight.   (Document 10 attached to ECF No. 9 at 38-42).

After summarizing the testimony of the club bouncer that he had seen Petitioner walking away from the club prior to the shooting, counsel turned to Phelps and Young, presenting the following argument:

> How many inconsistent statements were made by Sharif Phelps, Tashon Young?  That door didn't work.  That door didn't open.  I was standing outside when he was standing next to me.  He wasn't standing next to me.  He was down the street.  He was up the street. And all of these statements were taken within hours of this event. It wasn't as if they're trying to necessarily remember these things two years later.   Hours after the event, they didn't know where they were standing, who was standing, where they were, which door they came out of, who was with them and who was Q.   And [all these inconsistencies were] multiplied by the ineptitude of the investigation.

(*Id.* at 41-42).

Clearly, counsel did present an argument based on the inconsistent testimony, and argued that the jury should take the word of the club bouncer over that of Phelps and Young.  That counsel likewise addressed many of these same supposed inconsistencies on cross examination, as did counsel for Petitioner's co-defendant, further demonstrates that Petitioner has already received the benefit of the argument he now argues counsel should have made.   All of those inconsistencies were brought to the jury's attention through cross examination and the closing statements of both defense attorneys in this matter, and the jury still convicted both defendants.   It is thus clear that counsel was not deficient insomuch as he did argue that the inconsistencies weighed in favor of rejecting the testimony of Phelps and Young in favor of that of the bouncer, and that Petitioner was in any event not prejudiced as the result of this matter would not have changed had counsel presented further argument along this line as the jury was presented with and rejected that

argument at trial.   Thus, Petitioner's final ineffective assistance of counsel claim is without merit and provides no basis for habeas relief.

**4.  Petitioner's Vouching Claim**

Petitioner also asserts that the prosecutor in this matter improperly vouched for the credibility of Phelps and Young during his summation.   A prosecutor improperly vouches for a witness when he assures the jury of that witness's credibility on the basis of his personal knowledge or some other information outside of the testimony and evidence presented at trial.   *Judge*, 119 F. Supp. 3d at 288.   As the Third Circuit has explained,

> A prosecutor's vouching for the credibility of a government witness raises two concerns: (1) such comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury; and (2) the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence.
>
> . . . .
>
> Our case law indicates that to find vouching two criteria must be met: (1) the prosecutor must assure the jury that the testimony of a Government witness is credible; and (2) this assurance is based on either the prosecutor's personal knowledge or other information not contained in the record.   Thus, it is not enough for a defendant . . . to assert that the prosecutor assured the jury that a witness' testimony was credible.   The defendant must be able to identify as the basis for that comment an explicit or implicit reference to either the personal knowledge of the prosecuting attorney or information not contained in the record.   It follows that where a prosecutor argues that a witness is being truthful based on the testimony given at trial, and does not assure the jury that the credibility of the witness based on his own personal knowledge, the

28

> prosecutor is engaging in proper argument and is not vouching.
> Likewise, prosecutorial comment that points to a lack of evidence in
> the record which supports a defendant's argument that the witness
> is not credible is proper so long as the comment does not constitute
> an assurance by the prosecutor that the witness is credible.

*United States v. Walker*, 155 F.3d 180, 184, 187 (3d Cir. 1998); *see also United States v. Lore*,

430 F.3d 190, 211-12 (3d Cir. 2005); *Judge*, 119 F. Supp. 3d at 288.

Petitioner takes issue with the following comments of the prosecutor during summations

at his trial made in response to defense counsel's attacks on the credibility of Phelps and Young:

> Now, this is an identification case.  This case comes down to the
> veracity, the integrity, the believability, the credibility of the
> identification of the shooters; in this case [by] Sharif Phelps and
> Tashon Young.  Obviously there are two other witnesses from the
> bar who did not witness the shooting and have other information.
> You must decipher in the case when a witness takes the stand and
> you consider his testimony . . . material – is he . . . intentionally
> trying to deceive me by saying to me something of significance,
> something of importance that isn't true, or are inconsistencies, if you
> find any[,] about matters that are collateral, are about outside, not
> germane to the issue[.]  If you found, for example, that Sharif
> Phelps intentionally misled you as to the identification then reject
> what he says; then reject what he says.
>
> You have to decipher between the material
> misrepresentation to you or attempt to do that and something that is
> insignificant in the proofs of the case. . . .
>
> [The prosecutor then argued extensively that the failure of the
> township to dispatch a crime scene forensics unit in this case did not
> affect the credibility of the witnesses, and regarding the testimony
> as to police investigation in this matter, ultimately suggesting that
> none of those issues were relevant to the question whether the
> identifications in this case were accurate.]
>
> One witness [in this case] said he heard shots.  Then he saw
> the people with the guns, Sharif Phelps [testified to that].  You
> know, not everybody is exactly where they're planted.  If you had
> Sharif Phelps and Tashon Young come in here and tell you I was

29

exactly here, he was exactly here, the shooter was exactly there, then you would say to yourself that sounds a little fishy to me.   It is more credible and believable when there are differences, again, on immaterial things.

What's material, what is significant, what is important is the identification of the shooters, not if I turn this way, I turn that way. [Counsel then further discussed the physical evidence found at the scene.]

. . . If something was vastly different between what Sharif Phelps said and Tashon Young said, vastly different – you know, four guys came up in a car – and one of them didn't say that – then you say to yourself okay.   But the major consistencies are there.

. . . .

You must look at the veracity of the identification in the case.   Now, from the beginning the – consider that incident in the bar, and consider not what happened, it's no big deal, really.   But inside the bar Sharif Phelps and Tashon Young had an opportunity there to look at and see [Petitioner]; remembered him because he had an argument with [the victim] or was having this argument with him; afterwards described him' didn't know him; described him [and his] tattoo.   And I had him stand up here not to embarrass him – all right – so you could see the facial markings which were described by many witnesses.   Bur right after it happened, Sharif Phelps doesn't know [Petitioner], yet he describes him; [his] jacket, light skin, you know, the facial markings, but I do know the other guy.

So when you consider the veracity of the identification here, consider why would Sharif Phelps, of all the people in the world, of all the people he knows, take a guy [he] went to tenth grade with, and [try to] put this murder on him?   Why would Sharif Phelps do that?   Not a guy he had a problem with in high school.   So he says I know that guy.   That's Malik Simmons.   I went to high school with him.   I went to high school with one of the shooters.

So [detective] Bzik doesn't go out and arrest Malik Simmons.   She gets a photo display.   She takes photos of people, of Malik Simmons and people who look like Malik Simmons by age, by hairstyle and other factors.   You're going to have the pictures.

30

You look at them.   And she puts it in a photo array, and [s]he says she has another detective [show it to Phelps], and [Phelps] says that's Malik Simmons, and picks him out.   In all of these photos you have to consider the identification, and you must consider these out-of-court identifications.   [On 11/27/04], Sharif Phelps sits down with a detective; this case Detective Gregory.   [Detective] Bzik first gives Detective Gregory six photos of people, one of whom is Malik Simmons.   She doesn't tell Detective Gregory who Malik Simmons is.   She didn't tell Detective Gregory, hey, our suspect's number whatever.   Why?   So there's no possibility of suggestion.   There's no possibility of the detective on the case [influencing the outcome of the identification by pointing out the suspect].

[Counsel then reiterated that the witnesses were all given proper instructions during the various photo arrays, and noting that a different uninvolved detective conducted each array.]

Sharif Phelps picks out a picture, signs the back, and the picture he picks out is Malik Simmons.   On the second page he writes that's the person that shot my brother.

So when you consider the veracity of the identification, consider why would Sharif Phelps pick out a picture of a guy he was in tenth grade with because he knew him from tenth grade. Perhaps, he did that because [the shooter] is the person he knew from tenth grade.

After that, Tashon Young is shown a phot array with Malik Simmons' picture in it.   He is at headquarters that night.   He doesn't even want to get involved at first, and his cousin got shot. Fear.   But he comes to headquarters, and [Detective Bzik] gives a photo array on that date that is shown to Tashon Young by . . . Detective Harold Wallace.   Again, look at the photos.   They talk about after they go over the instructions, Harold Wallace signed it, Tashon Young signed it.   They put the pictures out one at a time to see if the witness identifies him.   Harold Wallace doesn't know who Malik Simmons is.   Harold Wallace doesn't know anything about the case.   He doesn't know even if [detective] Bzik has included a suspect in this package.   And Tashon Young, who doesn't know Malik Simmons, who does not know him, picks him out as the shooter.   Ask yourselves, [were] the procedures used [for these] out-of-court identifications . . . fair?   I submit to you they

31

were.

Did you observe during the course of this case any real challenges to those procedures?  I submit to you that you did not.  And there's a reason for that.  Because they were fair.  And given the instructions, given the photos used, given the detectives, a variety of detectives who are not involved in [this case].  [Detective] Bzik shows those pictures to Mr. Gibbs.  He says I can't be sure.  The question is asked of Detective Gregory, well, so what Mr. Gibbs said is . . . Malik Simmons, wasn't involved in this case.  No, that's not what Mr. Gibbs said.  Mr. Gibbs didn't identify Malik Simmons; not saying he was there, not saying he wasn't.

The fact that you have in this case ID's not made, to me, I would argue to you demonstrates [the] credibility of the officers who did the ID's.  If this was some grand conspiracy against Malik Simmons because maybe, you know, somebody was mad at him from tenth grade, don't you think all the ID's would be positive?

Oh, yeah, Mr. Gibbs didn't identify Malik Simmons as being there.  The fact that Mr. Gibbs didn't identify Malik Simmons from being there shows the credibility and the integrity of the procedures used to show the witnesses photos in this case.  And Sean Dubose didn't identify [either defendant], but he . . . doesn't mean they weren't there by his account; it means [he couldn't say that they were].  And those lack of ID's demonstrate the integrity [of the process].

Then they call them in on the 29th because [Detective] Bzik is still trying to figure out who the second guy was.  She knows he has a tattoo under his eye.  She knows he has some tattoos on the neck.  She knew she had a description of what he was wearing, and she doesn't have a name.  So she calls Sharif Phelps, the eye witness to his brother's death.  She calls him into [the prosecutor's office], and she puts certain criteria in[to a computer such as] age, skin coloring, tattoos, markings and so forth, and she comes up with a criteria, and he looks at a bunch of photos and he doesn't recognize anybody.  And then she tweaks the criteria.  She's doing what she's supposed to do.  She's continuing the investigation to find the other shooter in the case.  And in looking at the picture of [Petitioner] there is, by Sharif Phelps, an emotional outburst.  Now he's not going to sit here and tell you he was crying.  He's a 20-something-year-old guy, a little upset.

32

Her testimony is he spits at the machine.   He says that's the person who shot my brother, or words to that effect.   It's an emotional response.

She did not characterize her investigation based on emotional responses, but that unsolicited response, I submit to you, demonstrates the veracity of the ID.   Whose picture is it that he reacted to like that?   [Petitioner's.]   But she doesn't stop there.

Now [Detective Bzik] gets, or attempts to get pictures of [Petitioner] and people who look like him so she can do one of these photo arrays with the witnesses and that individual.   And she can't find pictures with the same tattoos and so forth.   She takes photocopies and makes them all look similar.   That's fair to the person who is the suspect.   That's more fair certainly than just putting a person with a tattoo in and other people without.   So she takes that extra effort to make sure they look alike.   And now Sharif Phelps calms down, and [Detective] Frisk goes over with him the photographs, and he picks out [Petitioner's photo].   And don't forget in these photo arrays the name Rakhil Shakyer is also used interchangeably with [Petitioner's] name.   And one at a time these pictures are shown, and these are the actual ones shown, and he signed the back of the person he said shot his brother, and he filled out a form that indicated that.   That was on the 29th of November 2004.   [Detective] Frisk, [is] not involved in the investigation[,] . . . doesn't know who [Petitioner] is, [who] Rakhil Shakyer is; doesn't know even if Detective Bzik included a suspect in this; doesn't know what stage her investigation is, or what the status of it is. That's another out-of-court procedure.   There has been no challenge to those . . . procedures[.]   And ask yourself, why would Sharif Phelps just pick [Petitioner] out of the blue?

So then [Detective] Bzik gets original photos of people who look like [Petitioner], who have similar facial markings to [Petitioner], and takes them to Irvington where Detective . . . Holmes reviews them with Michael Gibbs, the bouncer.   Michael Gibbs, we know, didn't see the shooting, never said he did.   And Michael Gibbs picks out a picture.   On this form it says [he picked Petitioner] as the individual he saw have an argument [with the victim], and who he escorted out.   That's corroboration of Sharif Phelps' ID.   And, again, Detective Holmes was not involved in [the case.]   And why would Sharif Phelps just pick this individual out

33

who then happens to be the same individual Michael Gibbs identifies as having an argument with [the victim]?

When you look at all of these procedures in the case, the photo procedures – again, Tashon Young, on January 12th, is shown a photograph display by [Detective] Jackson in the Prosecutor's Office with a picture containing [Petitioner].   On all these photos [Detective] Bzik goes to great pains to make sure all the photos look alike, whether it's putting marks on everybody's neck or to make them all look similar.

Tashon Young doesn't know who Sharif Phelps picks out, and he picks out a picture of [Petitioner].   So there has been very little challenge to those identifications; certainly not to the procedures.

In court, . . . Sharif Phelps was asked to identify the person or persons who shot his brother, and he pointed out [Petitioner] out here.   Tashon Young was asked to identify the shooter or shooters, and he pointed [Petitioner] out.   Both individuals pointed Malik Simmons out as well.

So when you look at the believability and the veracity of the investigation, I submit to you there was an opportunity for each individual, Tashon Young and Sharif Phelps, to view the people in the bar, to view [Petitioner] and Malik Simmons in the bar, outside the bar.   There was enough light.   There's motive.

I don't have to prove motive.   It's not a good motive, of course, to kill somebody, but there was some kind of a dispute between [Petitioner], Malik Simmons who was with him, and [the victim].

Everything is consistent also when you look at other evidence in the case; not who was standing where, and if everybody was in a line, and all this inconsequential nonsense, but look at some hard evidence in the case.   The day it happened, or thereabouts, Sharif Phelps and Tashon Young said there were revolvers used. Now, they didn't know what would be recovered from the crime scene.   The fact that they said there were revolvers used, the fact there's no shell casings because revolvers don't leave shell casings is indicative of their credibility.   When they said it – and you have to keep in . . . mind – the times people said things.   When they said

34

it, they didn't know [what the investigation would produce].   Do you think if there were shell casings all around here you wouldn't be hearing they said there were revolvers used, and yet there were shell casings.   So that couldn't be true.

I say the flip side.   When you're looking at the veracity of their identifications, of the credibility of them, look at what else is in the case that supports what they say.   And that's something significant, I submit to you, that supports what they said that day.   They said [Petitioner] shot first in the leg area.   He was shot in the leg.   Now, he was shot a number of times.   You may say, well, coincidence.   They – Sharif Phelps indicates I think Malik Simmons shot him in the chest.   He was shot in the chest.   The bullet didn't – you know, as you recall the ME talked about it going into the right side, outside the left.   You will see pictures of all this.   [The victim was} shot in the chest.   I mean, is that just a good guess?   I submit to you it wasn't.   That's consistent with the physical evidence in the case.   He was shot in the leg.   The ME has it down here as C-2.   He was shot in the right hip, and he was shot in the back.   And so when you examine the credibility, look at what else is out there.   Not who was standing where.   Who would remember that?   How can you possibly know where exactly everybody is facing and what angle everybody is at?   He knew the guy from high school.

He thought, you know, we kind of made up inside.   Things are cool.   He was wrong.

So they walked out.   You look at what Sean Dubose said, how he was in the bathroom, and Tashon Young said that on the stand.   We went in the bathroom, kind of, you know, I think it was making up.   Sean Dubose said something similar, shake hands, whatever.

You know what?   You could sit here and make fun of these witnesses – whatever, whatever – with the way they talk.   You know, it's really irrelevant.   What matters is your assessment, your assessment of them on the stand; their demeanor, whether they were being up front with you with what happened or not.

I submit to you they're consistent in all the major facts of this case.   Who shot first?   [Petitioner] did.   Then Malik Simmons started shooting.   And then I can't say, Sharif Phelps said, how

35

many shots or who shot where.   Can you imagine the horror?

We sit here two and a half years later, and what are we talking about, did he have a hat on.   That's ridiculous.   You imagine the horror of hearing a bunch of gunshots and seeing your brother die, seeing your brother with blood coming out of his mouth, and we're talking two and a half years later about a hat.

Think of the significant important details.   If you think that Sharif Phelps and Tashon Young got up and lied to you about who they identified as the shooter, and who they picked out in all of these photo arrays, then reject the case.   If that's what you think, then reject the case.   But don't get hung up on crime scene, and what should have been done by Irvington when it doesn't matter.   It doesn't matter to the integrity of this investigation, and it doesn't matter to the integrity of the identification.   Because guess what? Crimes were committed.   Crimes were solved.   Trials were had before CSI ever came on TV.   It's a lot of nonsense thrown out there.   And it doesn't – like I said, it comes down – [Defense counsel] said it.   I say it.   The heart and soul of this case is the integrity of their identification and their credibility.   I submit to you it's only two witnesses.   You don't need 20 if you find these witnesses believable.   These were the witnesses we have.   These were the witnesses that came forward.   And look at how their identification from day one, what they said, it fits with the medical evidence.   It fits with the ballistics or lack of ballistics evidence.

There aren't shell casings found; not because crime scene did a bad job.   There aren't shell casings found because the killers, [Petitioner] and Mr. Simmons, used revolvers.   Revolvers were their weapons of choice.

There were no guns found because the killers took the guns with them.

And so when you look at the identification, they're not sophisticated people.   They're young men.   But their story . . . on the stand as to what happened and how it happened is consistent from the first day it was told until every identification procedure until now, and I submit to you that is proof beyond a reasonable doubt that [Petitioner] and Malik Simmons were out there; were the shooters.

> And then you must consider, if you get to that identification, and I submit to you the facts are sufficient that you should, given all the evidence in the case to positively identify these two individuals as the shooters, not because they had a prior argument in the bar. Because they're the shooters.  Because they're the people who – [the prosecutor then referred to the testimony of Phelps and Young] did you see them with a gun?   Yes, I did.   Did you see them firing a gun? Yes I did.

(Document 10 attached to ECF No. 9 at 57-80).

Viewing the prosecutor's statements in context, it is clear that her statements do not constitute improper vouching.   The prosecutor did not suggest that the eyewitnesses were credible based on her own opinions, or based on evidence or witnesses not provided, but instead argued at length that they were credible based on the broad strokes consistency of their testimony, the consistency of that testimony to the available physical evidence, and that there was no improper police identification procedures used to color their testimony with any suggestion of coercion in their identifications.   All of these comments were made in direct response to arguments made by defense counsel focusing on minor inconsistencies in their stories and statements regarding hats, placement, and the like, as well as on the lack of physical evidence found on the scene.   In this context, it is clear that the prosecutor did not improperly vouch for the witnesses, and that her comments were fair responses to the arguments of the defense during summation.   Although somewhat meandering, counsel's summation focused on the evidence in the record as to police procedure, statement consistency, and the physical evidence to argue that both Phelps and Young were credible witnesses, and that their testimony should be accepted.   Indeed, counsel even suggested that, should the jury not believe them, they should reject the State's entire case.   It is thus clear that the prosecutor's arguments did not constitute improper vouching, were entirely fair

comment, and provide no basis for habeas relief.


**5.  Petitioner's jury claim**

Petitioner next claims that his trial's verdict was compromised because "extraneous influence" entered the jury room.   Petitioner bases this assertion on the following colloquy involving the trial court and defense counsel, shortly after the trial court reiterated that the jury was to discuss the case only during deliberations in the jury room:

> [Defense Counsel]:   Judge, if I may, I appreciate your cautioning the jurors regarding any extrinsic deliberations, but I am advised – obviously secondhand – by somebody who was outside the courthouse yesterday that, in fact, there was a conversation between supposedly two jurors; one who could be recognized immediately, and another who was described but not recognized until that person is seen again in some form or another discussing some aspects of the case.
>
> I don't really know if I have an application at this point of any sort.   I just want to draw it to the Court's attention so that in the event that – my concern is that there were extrinsic deliberations outside the courtroom which obviously were against the Court's rulings and, of course, against the Rules of Court.   I don't know which way, one way or the other, if that's beneficial to the defendants or State or vice versa.    The point is it's inappropriate.
>
> [The Court]:   Well, I have addressed the jurors continually with regard to that, and I have no – taking your word, Mr. Simms, based upon the information that was relayed to you, and I don't think I have a need to voir dire the jurors at this time.
>
> I have several concerns, and I gave a very strict admonition this morning with regard to it because we're at a sensitive point in the case.    That's one of my concerns is juror discussions outside the deliberation room.
>
> A second concern is that someone from the defendants' side was close enough to a juror outside the building to overhear some

type of a conversation.

> So what we may have to do is let the jurors go, and then maybe 15 minutes later disperse the audience, especially because there was some type of a discussion outside the hallway yesterday that got kind of heated among several individuals who were in the gallery.   So I'm not saying that the information you got from an individual, that that person was wrong, but that tells me that they are a little too close to some jurors.   That's a concern too. . . .

> [Defense counsel]:   And I agree, Judge, and the problem is not – the problem, the fact of the matter is there is a lot of people observing this trial which is perfectly acceptable, both sides, and people do leave at the same time.

> [The Court]:   Yeah, but see we have the – my officers escort the jurors out first.   We don't allow the other individuals to leave at the same time.   So maybe we'll have to wait even more time to do that.   And, again, I'm not saying that the person was wrong [about] what happened here, that it was an intentional situation, but it tells me there might be a little bit too much close contact, and we'll keep our eye on that too.

> [Defense counsel]:   Thank you.
. . . .

> [The Court]:   [Counsel], if this individual appears, and you get additional information, we'll address it on the record.

(Document 11 attached to ECF No. 9 at 7-8.)

In *Remmer v. United States*, 347 U.S. 227, 229 (1954), the Supreme Court held that, in a criminal case, "any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties.   The presumption is not conclusive, but the burden rests heavily upon the Government to establish . . .

that such contact with the juror was harmless to the defendant."   As the Third Circuit has explained, however, courts should apply that presumption "only when the extraneous information is of a considerably serious nature."   *United States v. Lloyd*, 269 F.3d 228, 238 (3d Cir. 2001). "In particular, [courts] have tended to apply the presumption of prejudice when a juror is directly contacted by third-parties."   *Id.*

In this case, the only suggestion in the record of any improper behavior involving the jury is a secondhand account of someone claiming to defense counsel that two jurors were discussing the case outside of the jury room.   No sworn testimony to that effect was offered, nor any type of sworn statement.   Even assuming, as the trial court did, that defense counsel was accurately recounting what this unknown person alleged to have occurred between these two jurors, it is clear that neither the judge nor defense counsel viewed the actions of the two jurors to be "considerably serious."   There were no allegations, let alone evidence of any contact by third-parties to the jurors, only that two jurors discussed the case themselves.   Indeed, the court had only just finished reiterating that the jurors should only discuss the case in deliberations when these allegations were raised.   It is clear to this Court that the vague, secondhand allegations offered by defense counsel, even if accepted as true, are not of a sufficiently serious nature that they would raise the specter of the *Remmer* presumption, and as such, without more, were insufficient to require that the trial court further inquire as to the allegations, nor was the State therefore required to rebut a presumption of prejudice.   Given the vague nature of the allegations, there is no evidence of any prejudice to Petitioner in the record, nor does Petitioner present any basis for a finding of prejudice other than the inapplicable *Remmer* presumption.   Given the vague allegations, the trial court's reiteration that jurors were not to discuss the matter outside of deliberations, and the lack of third-party

40

involvement or any sufficiently serious extraneous contact, there is no basis in the record to conclude that Petitioner suffered any prejudice, and thus his claim is insufficient to warrant habeas relief as the state court's rejection of his claim was neither contrary to nor involved an unreasonable application of, federal law.


## III.   CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. §2253(c), a petitioner may not appeal from a final order in a habeas proceeding where that petitioner's detention arises out of his state court conviction unless he has "made a substantial showing of the denial of a constitutional right."   "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented here are adequate to deserve encouragement to proceed further."   *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Because all of Petitioner's habeas claims are without merit for the reasons set forth above, he has failed to make a substantial showing of a denial of a constitutional right. Likewise, because jurists of reason could not disagree with this Court's conclusion that all of Petitioner's claims are without merit, the petition is not adequate to receive encouragement to proceed further.   This Court shall therefore deny Petitioner a certificate of appealability.

**IV. CONCLUSION**

For the reasons stated above, Petitioner's petition for a writ of habeas corpus is DENIED

and Petitioner is DENIED a certificate of appealability.   An appropriate order follows.


Dated: November 10, 2016                            _s/ Susan D. Wigenton_____
                                                    Hon. Susan D. Wigenton,
                                                    United States District Judge

42